State *v.* Coleman.

---

THE STATE v. DANIEL COLEMAN, Secretary of the State, &c.

Where by an act of the legislature three commissioners were appointed to settle the boundary line between the county of Gloucester, and the counties of Salem and Cumberland, who were to run, survey, mark and ascertain the line of partition, and one only of the commissioners surveyed and marked the line as returned, and neither of the others fixed the points, surveyed or marked the line, and was not present, when either was done, or exercised his judgment in respect to it, this court will, on certiorari, quash the return or certificate made by the commissioners to the Secretary of the State. If the true line has been found, it has not been done in the manner prescribed by the wisdom of the legislature. A line, surveyed, marked and ascertained in the manner prescribed as aforesaid, is the only line, which can bind the respective counties, or ought to be certified to the Secretary of the State.

Though the commissioners were appointed by a special act of the legislature, yet this cannot curtail the superintending power of this court. The principle, on which the authority of this court rests, to inspect the proceedings of inferior tribunals, especially of statutory erection, is in full vigor.

---

By an act of the legislature passed in March 1828, commissioners were appointed to ascertain and determine the boundary line between the county of Gloucester, and the counties of Salem and Cumberland, and were directed to make a report or

certificate of their survey to the Secretary of the State, to be recorded, and filed in his office. The certificate returned to the Secretary by the commissioners was brought into this court by certiorari, sued out on the part of the board of chosen free-holders of the county of Gloucester. Several reasons, assigned for setting it aside, were argued by *White* and the *Attorney-General,* for Gloucester, and by *Daniel Elmer,* for Cumberland.

EWING, C. J. The duties to be performed by the commissioners appointed, in the act of March 1828, to settle the boundary line between the county of Gloucester and the counties of Salem and Cumberland, are distinctly pointed out. They are to run, survey, mark and ascertain the line of partition, beginning at the southernmost and main branch of Great Egg Harbor River, at the head thereof, and thence upon a direct line to the head of Oldman's Creek. And in so doing, they are to conform in all things to the requirements of the general act of March 1798, for ascertaining the boundaries of counties and townships. By the latter act, *Rev. Laws,* 354, *sec.* 4, the commissioners or any two of them shall cause the line of partition or such part thereof as shall be specified in or become necessary by their appointment, to be run, surveyed, marked and ascertained; and the survey certified under their hands or the hands of any two of them, is to be delivered to the Secretary of the State, to be by him recorded and filed. The said line so surveyed, marked, as-certained and certified, is to be valid and effectual, and to be the boundary between the counties. By the phrase " cause to be run " in the latter act, I apprehend no substantial difference of duty is contemplated from what is prescribed in the other act, by the words " to run." The commissioners might not be prac-tical surveyors, and would, in such case, find the aid of profes-sional artists requisite. But the work was to be performed un-der their inspection. They were to direct, to guide, to judge. If the termini or either of them were uncertain, the united opin-ions of at least two of them were to fix the location. The mode of expressing the duties of the commissioners, may be somewhat simplified by using some of the words of the legislature, compre-hending, however, the meaning of the whole. The commissioners were directed to survey and mark the line of partition.

State *v.* Coleman.

From the affidavits of the commissioners themselves, which have been laid before us, it appears to me, the duty was left to be performed and was performed by one only. One only fixed the point, which has been certified in their return, as the head of Egg-Harbor River. One only surveyed and one only marked the line as returned. Neither of the others fixed the point, surveyed or marked the line, was present when either was done, or exercised his judgment in respect to it. The business was concluded, as appears by the affidavits, in the following manner. Beginning at the head of Oldman's Creek, the commissioners caused an experimental line, to be run by a practical surveyor, until it struck Egg-Harbor River. Neither of them was satisfied, that the termination of this line was the point required, the head of the main branch of the river; one of them, William Irick wishing to go to the head of another branch farther westward, and the other commissioners, Messieurs Swain and Earl being of opinion, they were already too far down the branch. Differing thus materially, Mr. Irick soon withdrew from farther service. The remaining commissioners, as Mr. Earl testifies, " agreed as to near about the place where the head of the southernmost and greatest branch of Egg-Harbor River should be." They fixed a post or stake " subject to be removed either above or below, as the course which they agreed to run from the head of Oldman's Creek should strike the branch." They agreed to this stake or post, as an object for which the surveyor should run from the head of Oldman's Creek, with directions to strike it, if he could, and if he could not, to place his monument wherever the course came out, if within two rods of the stake at right angles. " Joshua Swain and myself," says Mr. Earl, "had no hesitation in determining the principle, which was first to fix about the place where we considered the head of the southernmost and greatest branch of Great Egg-Harbor River to be, and having the course and distance run by Joseph Saunders, surveyor, and the angle given, Joshua Swain and myself agreed that a course should be calculated from his running, to start from the head of Oldman's Creek, and run a straight line to or near a stake fixed by us, the stake to be moved up or down, so as to meet the intersection of the said course. " This agreement being made between us,"

State *v.* Coleman.

.continues Mr. Earl, " Joshua Swain returned home and left me to prosecute the work and mark the line as agreed to be es-tablished as the county line, which I accordingly did with the assistance of Jacob Wick and others." The line as surveyed by Mr. Earl was marked at sundry places on the route, by the erection of stones, and the notching of trees, and " fell," Mr. Earl says, " about three or four rods above the stake, and at right angles, about twenty-five feet or one rod."

It thus appears that a random line was run, a random post placed, and a principle or method of ascertaining the true line was agreed upon. The residue of the duty was performed by a single commissioner. He surveyed the line which was return-ed and certified as the boundary line. It was marked by him, and he fixed the terminus at Egg-Harbor River.

From this view of the case, it appears to me, that the duty of the commissioners was not performed either in the spirit or the letter of the act of the legislature.

Both these commissioners express their opinions, in their affi-davits, that the line described in their certificate to the Sec-retary of the State, is the true boundary line between the coun-ties. Into the merits of this question, I do not propose to enter. Over that subject, the jurisdiction is I think in their, not in our, hands. The same claim of correctness might, however, very probably, have been made, and with as much truth and justice if the other commissioners had altogether remained at home and confided the whole practical operation to Mr. Earl. If the true line has been found, it has not been done in the manner pre-scribed by the wisdom of the legislature; and we have already seen that a line in that manner surveyed, marked and ascertain-ed, is the only line which is to bind the respective counties, or ought to have been certified to the Secretary.

Upon the argument at the bar, a strong doubt, if not a full conviction, was expressed by the defendant's counsel, that a writ of certiorari to remove the proceedings and certificate now in question cannot be sustained. There is, I think, no room for doubt. The consideration that the commissioners were appoint-ed by a special act of the legislature, cannot curtail the super-intending power of this court. The principle on which the au-thority of this court rests to inspect the proceedings of inferior

State *v.* Coleman.

tribunals, especially of statutory erection, is in full vigor. Indeed the special act itself contemplates that their proceedings shall be only as valid and effectual, as if their appointment had been made in the ordinary mode. The jurisdiction of this court was laid down in *Ludlow* v. *Ludlow,* 1 *South.* 389, in terms at once broad, explicit and correct. " It has the superintendence of all inferior courts, both civil and criminal, of all corporations in the exercise of their corporate powers, and of all public commissioners in the execution of their special authorities and public trusts. It causes their proceedings to be certified before it, in order that, upon inspection, they may be stayed, affirmed or set aside as the case may require."

The return or certificate made by the commissioners to the secretary ought, in my opinion, to be quashed.

DRAKE, J. was of the same opinion

FORD, J. A certiorari was sued out in the name of the State of New Jersey, against Daniel Coleman, Secretary of the State, defendant, commanding him to send and certify to this court, a return existing on the files in his office, which was made by Joshua S. Earl and Joshua Swain, two of the commissioners appointed by an act of the legislature of the 1st of March 1828, to run, survey, mark and ascertain the partition line which divides the counties of Salem and Cumberland from the county of Gloucester; the writ being allowed at the instance of the county of Gloucester, upon their complaint of being aggrieved by the proceedings of those commissioners. On the argument of the cause an objection was taken that the Secretary of the State was made defendant instead of the county of Gloucester. The command in the writ for the Secretary to certify the return as it existed in his office, was admitted to be proper and necessary ; but as he was no party to the proceedings of the commissioners, nor any way concerned in interest, that he was improperly made defendant. The objection is certainly well founded. The statute directs that before the commissioners proceed to business, notice shall be served on the board of freeholders of each county, thus plainly shewing them to have been the parties intended. Two of those counties have signified their acquiescence in the return of the commissioners, but the county of Gloucester alleges itself aggrieved ; and the State, which is always

plaintiff in matters of a public nature, sends its writ making the aggrieved party defendant in order to listen to the grounds and reasons of his complaint. As the secretary has no complaints against the return, it was wrong to name him as defendant; but as it is only an error in form and has no bearing on the merits of the return, it may be amended and the board of chosen freeholders of the county of Gloucester be substituted for the name of the secretary, as was done in the case of the *State* v. *Kirby*, 2 *South.* 835. We come then to consider the merits.

The statute appointed three commissioners, the two above named and William Irick, " to run, survey, mark and ascertain " the aforesaid partition line, " beginning at the southernmost and main branch of Great Egg-Harbor River, *at the head thereof*, and thence upon a direct line to the head of Oldman's Creek ; " conforming in all things to the directions of a previous act, *Rev. Laws*, 353 ; the 4th section whereof, gives power to the commissioners or *any two* of them to cause such line to be run and ascertained.

First. The first objection to their proceedings is, that the head of the branch of Egg-Harbor River was fixed upon by two of the commissioners, without their having a consultation with the third commissioner ; but the affidavits do not support the fact on which the objection is founded ; on the contrary, they show a consultation among the three commissioners touching the head of this branch, on which each one gave his opinion, two of them adjudging it to be *at*, or *about* the place where they had planted a *stake*, and William Irick adjudging the head to be further west ; so they consulted altogether about the place of the head, and as they could not accord in one opinion, the *stake* was fixed on by a majority. The legislature was not willing that a commission should fail of being executed by the commissioners being equally divided on any point, and they provided against such a contingency by naming an odd number of commissioners, any *two* of whom had power, under the 4th section of the general act, in case of disagreement, to cause the said line to be ascertained and marked. I take this to be a full answer to the first objection.

The second objection to the return is, that the commissioners adjudged a certain stake to be, not the head, but *at or about* the

State *v.* Coleman.

head of the branch. This objection, I apprehend, has nothing substantial in it, and is only a play upon words about a matter that is sufficiently certain. The origin of a river or branch is very seldom found to be a spring or fountain whose centre could be readily taken, but a swamp overspreading several acres of ground, through which the water flows in guts of various directions, except in a drought, when some of them become dry, or stagnant, or the motion in one becomes different from that in another, or what was a water channel at one season, may have none existing in it at another season. These appearances seem to have embarrassed the commissioners in this case and caused a split in their opinions. Who could lay his finger on a spot in such a swamp and say unhesitatingly, here is the head of the branch, and no where else within a chain, a rod, or an inch ? When two of the commissioners planted a stake in the swamp for the head of the branch, they did not mean that more than any other spot within a couple of rods ; but they calculated a course from Oldman's Creek to it, declaring that if it came out within a couple of rods, it would strike the head of the branch as near as in their best judgments they could ascertain it. On running this calculated course from Oldman's Creek a distance of more than twenty miles, it came out within two rods of the stake, and therefore they returned *that course as the true one* from Oldman's Creek to strike *the head of the most southerly branch of Great Egg-Harbor River.* They returned it a certain course, not *at or about* such a course. There are no such words in the return. They are only in the conversations of the commissioners when deliberating among themselves. If the proceedings should be vacated on this account, a second set of commissioners might vary two or three rods from them, and a third set two or three rods from these, and it could not be demonstrated that either of them was wrong, in respect of two or three rods for the head of a branch which within that distance ambulates perhaps three or four times a year with the seasons and state of water in the swamp. It is no more a mathematical point than the shore of a river which varies more or less with a shower of rain. The return gives a certain course from the head of Oldman's Creek to the head of the branch in question, which is not contradicted by the discussions or the conversa-

State *v.* Coleman.

tions of the commissioners, nor shewn to be in any respect wrong. We must therefore consider it right.

The third objection to the return, is, that when Sanders, who was nominated by all three of the commissioners as a practical surveyor to run and mark the line, had executed that duty only in part, his place was assumed and the remaining duties of it performed by Joshua S. Earl, without the consent of William Irick. Some doubt whether the commissioners had any power of delegating their authority to any surveyor to run the line, was flung out at the bar ; but the words of the fourth section are, " that the said commissioners or any two of them *shall cause* the said line *to be run* and *marked,*" and are decisive of their power. When the commissioners had settled the station at each end, and determined the point of compass from one to the other, the running and marking of the line left nothing in the discretion of a surveyor, it was simply a matter of skill, and they might have employed any skilful man and returned his work as their own, even if the statute had not given them power to cause it to be done. Few men beside practical surveyors could trace a line of this length accurately, if they had not some practical skill in adjusting the needle to its mark and sighting an object. If they might lawfully employ a surveyor, they might lawfully confide in his work, and I am not prepared to say that their attendance or that of a majority of them in the train of the surveyor was necessary. After Mr. Sanders had performed some part of the service for the commissioners, he declined to do any thing more; but it was necessary to continue the business, and by agreement of the two commissioners, Joshua S. Earl undertook to perform it ; he was a practical surveyor, and the skill and integrity of him and Sanders being equal, the commissioners neither gained nor lost by the exchange. But the act is objected to as proceeding from only two of the commissioners without a consultation with the third, supposing it to be an exchange, when it was no more than doing the surveying for themselves, as they had a right to do by the statute; they were to do or cause it to be done. It was not necessary that each one should have a compass, in order to survey for himself ; nor that each one should settle and look through the sights for himself. When such work depends merely on skill, it

State *v.* Coleman.

is done better by one person ; as when the amputation of a limb or extraction of a tooth has been concluded on, they are best performed by a single surgeon. It would be ridiculous to have two surgeons each with his hook on one tooth, or each pushing his saw on the same bone. The ministerial act of one commissioner is the act of the rest who concur in it. It was not the act of William Irick, who believing the line to be wrong, had withdrawn and would not aid or be responsible for doing it; but it was the act of the *majority*, who authorized it after consultation among the three.

The Fourth objection to the return is, that Joshua S. Earl run and marked the line by himself in the absence of the other commissioners. The absence of William Irick arose from his refusal to have this line run by any person, and his putting the responsibility for it on the majority, whose right to act without him is undeniable. It is the absence of Mr. Swain which forms the point of the objection ; yet he not only concurred in this course, but agreed that his fellow commissioner should run it, and is so entirely satisfied with the correctness of the work that he has adopted and returned is as the work of both. If he had attended the footsteps of Mr. Earl through the whole distance of twenty miles, and Mr. Earl had carried and managed the compass, it would not have been their joint act more than it now is. The commissioners had a right to confide in the ministerial acts of each other, and whether Mr. Swain was present or absent, can make no difference, unless it be argued that each one should have looked at the compass every time it was set, which farce is not required by either law or common sense. The two commissioners have caused the ministerial act to be done, and having returned it as being rightly done, it must so be considered by the court, until it is shewn to have been done wrong.

The fourth objection to the return is, that the marks are not made on a straight line. No evidence has been produced to this effect. The offsets were in another line which was an experimental line only, in order to find out by it the true course. That experimental line is not mentioned in the return and has nothing to do with it. Yet we cannot suppose it otherwise than

exceedingly accurate, when the course deduced from it hit a stake within two rods at the end of twenty miles. On the whole, the objections are altogether unfounded, and the return ought to be affirmed.                    Return quashed.

CITED in *Morris Canal ads. State,* 2 *Gr.* 427 ; *Smith* v. *Trenton & Del. Falls Co.* 2 *Harr.* 8; *N. J. R. R. & Tr. Co.* v. *Suydam,* 2 *Harr.* 63; *State* v. *Mayor, &c. of Jersey City,* 4 *Zab.* 665; *Carron* v. *Martin,* 2 *Dutch.* 597; *State* v. *Brown,* 2 *Broom,* 357.